<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| DUNKIN' DONUTS FRANCHISED RESTAURANTS LLC, et al., | : | |
| | : | |
| Plaintiffs, | : | **Civil Action No. 07-1923 (SRC)** |
| | : | |
| v. | : | **OPINION** |
| | : | |
| STRATEGIC VENTURE GROUP, INC., et al., | : | |
| | : | |
| Defendants. | : | |

<u>**CHESLER**</u>, District Judge

**INTRODUCTION**

This lawsuit arises out of the termination of four franchises engaged in the business of operating food service establishments located in New Jersey. Plaintiffs Dunkin' Donuts Franchised Restaurants LLC, Baskin-Robbins Franchised Shops LLC, DD IP Holder LLC and BR IP Holder LLC filed a Complaint on April 24, 2007, asserting claims for breach of contract and trademark infringement against Defendants, the franchisees and the owners of the franchisee corporations. With leave of Court, Plaintiffs filed an Amended Complaint on June 29, 2010, to add Dunkin' Donuts Franchising LLC as a named Plaintiff. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338 and 1367(a) and pursuant to sections 34(a) and 39 of the Lanham Act, 15 U.S.C. §§ 1116(a) and 1121. Plaintiffs contend that Defendants breached their respective franchise agreements in a material and non-curable way, justifying the Plaintiff franchisors' termination of the franchise agreements under the New Jersey Franchise Practices Act. Plaintiffs seek a declaratory judgment stating that Defendants' conduct violated the terms of

the franchise agreements and constituted good cause for termination and that Plaintiffs'

justifiably terminated the Defendant franchises and an injunction enforcing the termination of the

franchise agreements.[1]  The Amended Complaint also pleads for relief in connection with the

trademark infringement claims.  A bench trial on the breach of contract claim was held on June

8-11, 2010 and June 21-23, 2010.[2]  Upon hearing the evidence presented at trial, this Court finds

that Plaintiffs have demonstrated that it properly terminated the franchises operated by three of

the four corporate Defendants, and the Court will issue a declaratory judgment that Plaintiffs are

entitled to exercise their contractual rights of termination as to those three franchisees.


## BACKGROUND

Plaintiffs are corporations operating under the umbrella of the Dunkin' Brands, Inc.

franchise systems and are located in Canton, Massachusetts.  (6/8/10 Laudermilk Tr. 3:19-20;

6/22/10 Remillard Tr. 117:13-21; Joint Pretrial Order, Stip. Facts ¶¶ 1-4.) (Throughout this

Opinion, the Court will collectively refer to the Plaintiffs as "Plaintiffs" or "Dunkin'" for

simplicity.)  Plaintiff Dunkin' Donuts Franchised Restaurants LLC and Plaintiff Dunkin' Donuts

Franchising LLC are engaged in the business of franchising independent business persons to

operate Dunkin' Donuts shops throughout the United States.  (Joint Pretrial Order, Stip. Facts ¶

---

[1] The Court does not, however, address Plaintiffs' claim for an injunction in this Opinion as it was not a theory developed at trial.  For example, Plaintiffs introduced no evidence and made no argument concerning irreparable harm or the inadequacy of remedies at law, essential elements of injunctive relief.  *Monsanto Co. v. Geertson Seed Farms*, 130 S.Ct. 2743, 2756 (2010).

[2] Plaintiffs elected not to try the trademark infringement claims, conceding that Defendants are authorized to use the Dunkin' trademarks unless and until there is a judicial determination that their franchises have terminated.  (6/6/10 Tr. 46:11-48:7.)

1.) Plaintiff DD IP Holder LLC is the owner of the trademark, service mark, and trade name "Dunkin' Donuts," and related marks. (*Id.* ¶ 2.) Plaintiff Baskin-Robbins Franchised Shops LLC is authorized to use the trademarks, service marks and trade names owned by BR IP Holder LLC and to sublicense Baskin-Robbins franchisees, as independent business persons, to use these marks and trade names. (*Id.* ¶ 3.)  Plaintiff BR IP Holder LLC is the owner of the trademark, service mark, and trade name "Baskin-Robbins," and related marks. (*Id.* ¶ 4.)  Defendants Strategic Venture Group, Inc. ("SVG"), Easton Franklin Ventures, Inc. ("EFV"), East Brunswick Ventures, Inc. ("EBV"), and Milltown Ryder Ventures, Inc. ("MRV") are New Jersey corporations operating Dunkin' Donuts franchises in New Jersey.  (*Id.* ¶¶ 5-8.)  SVG entered into a Franchise Agreement with Dunkin' Donuts Incorporated on May 13, 2002 for the operation of a combination Baskin Robbins/Dunkin' Donuts retail shop at 1345 Route 1 South in North Brunswick, New Jersey.  (Pl. Ex. 1.)  EFV entered into a Franchise Agreement with Dunkin' Donuts Incorporated on November 20, 2004 for the operation of a Dunkin' Donuts retail shop at 1760 Easton Avenue, Easton Franklin Shopping Center, Somerset, New Jersey.  (Pl. Ex. 4.) EBV entered into a Franchise Agreement with Dunkin' Donuts Incorporated on July 31, 2004 for the operation of a Dunkin' Donuts store at 14-22 Prospect Avenue in East Brunswick, New Jersey.  (Pl. Ex. 7.)  MRV entered into a Franchise Agreement with Dunkin' Donuts Franchising LLC on August 4, 2006 for the operation of a Dunkin' Donuts store at 23 North Main Street, Milltown, New Jersey.   (Pl. Ex. 10.)  Individual Defendants Shetal Shah and Samir Desai are, and were at all relevant times, 50/50 owners of SVG, EBV, EFV and MRV.  (Joint Pretrial Order, Stip. Facts ¶ 9-10.)

Each of the Franchise Agreements identified above contain substantially identical terms insofar as the terms are relevant to this action.  (*Id.* ¶ 17.)   Central to this lawsuit, Paragraph 5.1.7 of each Franchise Agreement imposes an "obey all laws" requirement, which states:

> FRANCHISEE shall comply with all civil and criminal laws, ordinances, rules, regulations and orders of public authorities pertaining to the maintenance and operation of the Unit, including, but not limited to, those relating to health, safety, sanitation, employment, environmental regulation and taxation.

 (Franchise Agreement ¶ 5.1.7.)[3]

They also prohibit the franchisees from "do[ing] or peform[ing], directly or indirectly, any other act injurious or prejudicial to the goodwill associated with FRANCHISOR's Proprietary Marks and System(s)." (*Id.* ¶¶ 8.0, 8.0.1.)  They further provide that, among other bases, the franchisee shall be in default in the event of either of the following acts:

! "[i]f FRANCHISEE is convicted or pleads guilty or 'nolo contendere' to a felony, a crime involving moral turpitude, or any other crime or offense that FRANCHISOR believes is injurious to the System(s), the Proprietary Marks or the goodwill associated therewith, or if FRANCHISOR has proof that the FRANCHISEE has committed such a felony, crime or offense." (*Id.* ¶ 9.0.2.)

---

[3] The operative Franchise Agreements were submitted into evidence as Plaintiffs' Exhibits 1, 4, 7 and 10.  As noted, the parties agree that they contain identical terms regarding the franchisor and franchisee rights and obligations at issue in this case.  For simplicity, the Court will not cite to the various exhibits when it refers to the terms of the Franchise Agreements but rather simply cite the provision as "Franchise Agreement ¶ ___."

!      "FRANCHISEE permits the use of the Unit or Premises for any illegal or

unauthorized purpose, including, without limitation, palming off or substitution of

products under the Proprietary Marks or other marks of FRANCHISOR."  (*Id.* ¶

9.0.3.)

Additionally, the Franchise Agreements each contain a "cross-default" provision, which deems a

franchisee to be in default [i]f any other franchise agreement between FRANCHISEE and

FRANCHISOR or any affiliated entity is terminated by reason of FRANCHISEE's default

thereunder . . . ."  (*Id.* ¶¶ 9.0, 9.0.4.)  Default for any of these reasons is deemed uncurable under

the Franchise Agreements.  They state: "No cure period shall be available if FRANCHISEE  is in

default under any paragraph designated 9.0.1 through 9.0.4 above; . . . or if FRANCHISEE . . .

falsifies financial data or otherwise commits an act of fraud with respect to FRANCHISEE'S

acquisition of this Franchise or its rights or obligations under this Agreement . . . ." (*Id.* ¶ 9.1.4.)

Each Defendant franchisee received a Notice of Termination letter dated April 23, 2007.

(Pl. Ex. 13.)  The following day, this lawsuit was filed against the franchisees and their owners

Shah and Desai.  The Complaint filed by Plaintiffs pleads a breach of contract claim (Count I)

and various claims under the Lanham Act, 15 U.S.C. §§ 1114 and 1125, alleging infringement of

Dunkin's trademarks, unfair competition and trade dress infringement (Counts II-IV).  With

regard to the Lanham Act claims, both Plaintiffs and Defendants made representations at trial,

discussed in further detail below, which obviated the need for the parties to submit or challenge

evidence on those claims.  The trial focused on the breach of contract claim.

The main issue presented is whether the franchise terminations were justified by some material and non-curable breach of the Franchise Agreements in compliance with the New Jersey Franchise Practices Act.  Plaintiffs previously contended that Defendants had breached the Franchise Agreements by underrerporting sales and by failing to comply with federal payroll tax obligations, in violation of the "obey all laws" clause set forth at Paragraph 5.1.7 of the Franchise Agreements.  The Court circumscribed the factual grounds upon which Plaintiffs could proceed to prove that their termination of the franchises was justified.  The Court ruled that Plaintiffs could present evidence only of the franchise agreement violations identified in the Notice of Termination and the offending conduct identified in Plaintiffs' response to Defendants' interrogatory regarding acts that constituted reasons for the termination.[4] (6/8/10 Mot. In Limine Tr. 36:1-38:4; 6/10/10 Tr. 123:21-24, 124:24-125:8.)  It held, however, that Plaintiffs' proofs would not be limited to information of alleged franchisee misconduct that Plaintiffs possessed at the time the Notice of Termination was sent or to evidence detailed in the interrogatory response. (6/10/10 Tr. 123:21-124:10.)

Shortly before trial, Plaintiffs abandoned the theory of liability based on underreporting of sales.  The trial of the breach of contract claim was limited to the contention that Defendants violated the "obey all laws" clause by engaging in two kinds of conduct: (1) evading tax obligations, in violation of 26 U.S.C. § 7201, by paying employees' personal expenses without reporting the payments as wages and/or improperly deducting these payments as business expenses and (2) filing false tax returns, in violation of 26 U.S.C. § 7206.

---

[4] The Court made reference to Plaintiffs' Second Supplemental Answer to Defendants' Single Interrogatory.

Additionally, the Court notes that the trial did not encompass various counterclaims asserted by Defendants in their Amended Answer.  Though the Court granted Defendants leave to file an Amended and Supplemental Answer, Affirmative Defenses and Counterclaims, its March 22, 2010 Order also held that the counterclaims asserted in the Amended Answer were severed and would proceed to discovery and be tried separately from Plaintiffs' case in chief. (3/22/10 Order, docket entry 141.)

## LEGAL STANDARD

The parties acknowledge, and do not dispute, that the Franchise Agreements are governed by Massachusetts law, according to the terms the choice of law provision contained in each Franchise Agreement.[5]   The parties also agree that because the subject franchisees are located in New Jersey, they benefit from the protections of the New Jersey Franchise Practices Act, *N.J.S.A.* 56:10-1, *et seq.*, regardless of the parties' contracting for Massachusetts law to govern disputes concerning or arising out of the Franchise Agreements.  *See Liberty Sales Assoc., Inc. v. Dow Corning Corp.*, 816 F.Supp. 1004, 1008 (D.N.J. 1993) (holding that even though franchise agreement contained choice of law provision stating that Michigan law would govern, franchisor could not deny a New Jersey franchisee the protections of New Jersey Franchise Practices Act) (citing *Instructional Sys. v. Computer Curriculum Corp.*, 130 N.J. 324 342-45 (1992)).  With

---

[5] Each Franchise Agreement provides that "the resolution of all disputes between the parties bound hereunder, whether in tort and regardless of the place of injury or the place of the alleged wrongdoing or whether arising out of or relating to the parties' contractual relationship, shall be governed by the law of the Commonwealth of Massachusetts without regard to choice of law principles." (Franchise Agreement ¶ 11.3.) Each one further provides that "This Agreement shall be deemed to have been made in, and shall be interpreted, construed and governed by the laws of the Commonwealth of Massachusetts." (*Id.*, ¶ 17.0.)

limited exceptions, none of which the parties contend apply here, the Franchise Practices Act

requires that the franchisor provide written notice of termination to the franchisee before a

franchise may be terminated.  *N.J.S.A.* 56:10-5.  The notice must set forth the reasons for

termination.  *Id.*  The relevant statutory provision provides:

> It shall be a violation of this act for any franchisor directly or indirectly
> through any officer, agent, or employee to terminate, cancel, or fail to
> renew a franchise without having first given written notice setting forth all
> the reasons for such termination, cancellation, or intent not to renew to the
> franchisee at least 60 days in advance of such termination, cancellation, or
> failure to renew . . .

*Id.*  Consistent with that provision, this Court has rejected a franchisor's attempts to give post-

hoc rationalizations for a termination.  *Harter Equip., Inc. v. Volvo Constr. Equip. N. Am., Inc.*,

No. 3-01-CV-04040, 2003 U.S. Dist LEXIS 27210 at *16 n.2 (D.N.J. Aug. 4, 2004) (citing *Carlo*

*C. Gelardi Corp. v. Miller Brewing Co.*, 421 F. Supp. 237 (D.N.J. 1976)).  The Franchise

Practices Act further requires that a franchisor's termination of the franchise must be based on

"good cause," which is expressly defined as a "failure by the franchisee to substantially comply

with those requirements imposed upon him by the franchise."  *N.J.S.A.* 56:10-5.


**THE EVIDENCE AT TRIAL**

**I.     Dunkin's Investigation of the Defendant Franchises**

Edward Simoes, employed at the time by Dunkin' as a franchise service manager, visited

Defendants' stores several times each month in 2005.  (6/9/10 Tr. 104:9-12, 105:9-22.)  During a

November 2005 visit to the North Brunswick store, he noticed several stacks of cash marked by

pieces of paper with names on them.  (*Id.* 107:12  - 108:10.)  Simoes discussed what he saw with

Shetal Shah that day, and Shah informed him that he was cashing payroll checks.  (*Id.* 111:4-19.)
Simoes reported what he saw to Bill Gallo and suggested that Gallo conduct a labor audit of the
frachisee.  (*Id.* 111:21 - 112:2.)

Bill Gallo worked in Dunkin's Loss Prevention Department.  His job duties involved
investigating franchisees for improprieties with regard to their business.  (6/10/10 Tr. 26:21-25.)
His professional background includes twenty-five years of experience as a criminal investigator
at the Internal Revenue Service ("IRS"), an MBA in finance, certification as a fraud examiner,
and experience as a tax analyst and private financial investigator.  (6/9/10 Tr. at 125:19-22,
126:18-128:1.)

Gallo had instructed franchise services managers, including Simoes, to identify a
franchisee to be investigated for alleged violations.  (6/9/10 Tr.116:9-20; Pl. Ex. 42 at DD 2700.)
On November 21, 2005, Dunkin' initiated an investigation of the then-existing three franchises
owned by Shah and Desai.  (Pl. Ex. 42 at DD 2700.)  Gallo led the investigation and concluded,
based on the evidence he gathered, that the franchisees, Shah and Desai had violated the Internal
Revenue Code with respect to their corporate tax and payroll tax obligations.  (6/9/10 Tr. 129:5-
24, 134:19-25.)

As part of his investigation, Gallo requested that Defendants provide various documents,
including cash register tapes, bank statements, deposit tickets, canceled checks, corporate and
personal tax returns and supporting schedules for 2003 and 2004, profit and loss statements, daily
cash register reports, business and personal loan records for the period 1/1/04 through 3/11/06,
financial statements, payroll registers and W-2s for the period 1/1/04 through 3/11/06.  (*Id.* at
130:2-21, 131:7-22; Pl. Ex. 39.)  Gallo reviewed the financial records, which he considered of

great importance cases such as this one, in which fraud was suspected.  (6/9/10 Tr. 132:19-

133:8.)  He also interviewed several of Defendants' employees, through which interviews he

learned that the franchises had paid some personal expenses of the employees.  (*Id.* 135:9-25.)

Gallo testified that, based on his review of records provided by Defendants and on the interviews,

he found that Defendants had improperly failed to include the payments in payroll statements.

(*Id.*)

> ### A.     Interviews Conducted in the Investigation

On June 7, 2006, Gallo interviewed Mayank Patel, the manager of Defendants' North

Brunswick store.  (6/9/10 Tr. 135:25 - 136:23; 6/10/10 Tr. 55:3-6; Pl. Ex. 42 at 2716.)  Mayank

Patel told Gallo that one of the stores paid the monthly lease for his car and that Defendants also

paid a $790 premium for Patel's life insurance policy and for a $1400 plane ticket to India.

(6/9/10 Tr. 141:2-4; 6/10/10 Tr. 56:12-57:21.)   In reviewing Defendants' tax returns, Gallo

determined that Defendants deducted these expenses as ordinary business expenses, and did not

report them as compensation to Patel.  (*Id.* 134:19-141:9.)

On June 7, 2007 Gallo also interviewed Shah, who admitted that Defendants had paid

these expenses for Mayank Patel but had not booked the payments as income to Patel.  (*Id.* at

141:15-18; 6/21/10 Tr. 196:22-200:22.)  Shah explained in his testimony that he leased a vehicle

for Mayank Patel to use because he considered it necessary for the operation of the businesses to

have an employee able to transfer supplies or inventory among the stores.  (6/21/10 Tr. 197:22 -

198:17.)  He testified that he and Desai purchased a plane ticket for Mayank Patel to travel to

India in 2004 as a gift, as Patel was traveling to India to get married.  (*Id.* 198:22 -199:5.)  Shah

also testified that he considered the life insurance payment made on Mayank Patel's behalf to be

a fringe benefit and beneficial to the business, and thus deemed it a deductible business expense. (*Id.* 200:16-22.)

During this interview, Shah also admitted that one of the stores had paid the monthly rent of another employee, Jitendra Patel, since May 2005. (6/9/10 Tr. 141:15-20.) Jitendra Patel was the store manager for the East Brunswick store, and both he and his wife, another store employee, lived in the $870 per month apartment . (6/9/10 Tr. 145:22 - 146:7; 6/10/10 Tr. 57:10-21; 6/21/10 Tr. 203:1-14.) Gallo's review of the corporate records confirmed that rental payments were made for Jitendra Patel's apartment. (6/9/10 Tr. 146:8-12.) Shah explained in his trial testimony that leasing this apartment, located within walking distance of the East Brunswick store, solved the business's problem with employees calling in sick or not showing up for work. (6/21/10 Tr. 202:4 - 204:15.) Shah admitted treating the rental payment as a business expense, but testified that in giving it such treatment he did not intend to deprive the federal government of taxes. (6/21/10 Tr. 204:16-23.)

Gallo memorialized the information he gathered in the June 7, 2006 interviews in an email sent to his direct report at Dunkin', Jack Sullivan. (6/10/10 Tr. 55:7-22.) The email read as follows:

> Jack,
>
> I interviewed Mayank Patel, the manager of PC#337719 and obtained the following information:
>
> 1. Mayank stated that he never received cash as part of his salary. He was and is always paid by check. His niece [sic] is married to Samir Desai, one of the Franchisees. When questioned further he admitted that the Franchisees pay his auto lease payments and have been since July, 2005. The payment is $492.00 per month. The Franchisees pay his life insurance policy which amounts to $790.00 per year. The Franchisees also paid

Mayank $1400 for the purchase of a round trip airline ticket to India so that Mayank could visit with his wife and daughter.

For the past three years Mayank has travelled [sic] to and stayed in India for approximately 3 to 4 months each year.  While he is away he is not paid a salary and this explains why his salary is less than what an average managers [sic] salary might be.

2. When I completed my interview of Mayank, I spoke with the Franchisee, Shetal Shah.  He confirmed what Mayank had told me.  In lieu of speaking with the other 2 managers I aksed Shetal if they aare [sic] treated in the same fashion.  He stated that they have also been paying Jettendra Patel's rent since May of 2005 which amounts to $870.00 per month.  Jettendra Patel manages PC#340496.

I directly asked Shetal twice as to whether or not he paid any of his managers in cash.  He said he did not.

3. The benefits paid on behalf of Mayank total approximately $8,000, and the benefits paid for Jettendra total $12,000.  These amounts would be taxable to each of the managers.  In addition, in as much as this is paid in lieu of salary, withholdings were never deducted by the Franchisees from the monies paid to the managers.

Let me know how you think we should proceed on this matter.

[REDACTED]

Thanks,
Bill G.

(Def. Ex. 24.)

      Sullivan responded with a June 9, 2006 email that read:

          Bill-

          Write it up for termination.

(Def. Ex. 24; 6/10/10 Tr. 59:7-17.)

After this email exchange, the investigation of the Defendant franchises continued.  Upon his review of additional documents submitted by the franchisees, Gallo suspected that the businesses may have paid employee expenses other than Mayank Patel's car and Jittendra Patel's rent.  (6/9/10 Tr. 150:5 -157:12.)  On several occasions, Gallo had asked Shah whether the franchisees paid other employee expenses, but Shah responded that they did not. (6/9/10 Tr. 141:21 - 142:1, 147:18-22; Pl. Ex. 42 at DD 2716 and 2722.)

During an October 24, 2006 interview of Shah, Gallo questioned Shah about the corporate records of canceled checks indicating payments of other expenses.  (Pl. Ex. 42 at DD 2724-2725.)  The following items were discussed:

- SVG check in the amount of $990.00 payable to North Brunswick Manor for the December 2004 rental of Apartment 801.  Shah admitted to Gallo that it was a rent payment on behalf of Govindbhai Patel, a baker employed by Defendants, who was living in the apartment.  (6/9/10 Tr. 150:1-11; 6/10/10 Tr. 92:8 - 93:2.)

- SVG check in the amount of $1,050 payable to Rajubhai Patel, for the return of security for Apartment 712.  Gallo testified: "According to Mr. Shah, this individual was a baker who stayed at the apartment two to three nights a week and because he was not previously known to Shah, Shah requested rent security from this person, and this check represented a return of that security."  (Tr. 152:19 - 153:7.)

- EBV check for $5,100 payable to Rochester Institute of Technology, which Shah explained was a tuition payment for his cousin, who had done consulting work and written computer programs for the stores and would begin working for Defendants upon graduation.  (6/9/10 Tr. 155:5 - 157:2; 6/10/10 Tr. 96:7 - 97:6.)

They also discussed other checks in payment for Apartment 712.  (6/9/10 Tr. 153:15-155:4.)

Reading from the memorandum of his October 24, 2006 interview of Shah, Gallo testified:

> I told Shah that there was a check issued each month in 2004 to North Village Associates.  According to Shah this apartment was maintained by he and his partner and used by them from time to time in order to save time traveling to their own homes.  This apartment was also used for storage and by other employees for living quarters as needed.

(*Id.* 154:3-11.)

On October 24, 2006, Gallo also interviewed Jittendra Patel.  (Pl. Ex. 42 at DD 2719.) Jittendra Patel confirmed that both he and his wife worked for Defendant's East Brunswick store and admitted that Shah had been paying the rent for their apartment since June 2005.  (*Id.*) According to Gallo's interview memorandum, the monthly rent payment of $870.00 supplemented Jittendra Patel's salary.  (*Id.*)

In the course of his investigation, Gallo spoke with Defendants' accountant, Hemish Kapadia.  (6/21/10 Tr. 41:22 - 42:2.)  In their September 2006 conversation, Kapadia learned from Gallo that the franchise businesses had paid auto leases and housing for their employees. (*Id.* 39:20 - 41:13.)

**B.      Loss Prevention Report**

Gallo incorporated the findings of his investigation, including the information gathered in interviews and the discoveries made upon reviewing Defendants' corporate and tax records, into a November 3, 2006 report entitled "Loss Prevention Investigative Report."  (Pl. Ex. 42.)  (The report was referred to throughout the trial as the "Loss Prevention Report," and the Court will do the same in this Opinion.)  Gallo provided the report to his supervisor, Jack Sullivan, who in turn forwarded it to Jack Laudermilk, associate general counsel of Dunkin' and its director of litigation.  (6/8/10 Tr. 3:23-4:2, 38:8-27.)  Laudermilk reviewed the Loss Prevention Report, conferred with Jack Sullivan and with Dunkin's general counsel, and made the decision to terminate the Defendant franchises based on the contents of the report. (*Id.* 35:20 - 36:16, 61:20 - 62:9.)  He decided to terminate based on his belief that the franchisees had violated the law, which he formed in reliance on the recommendations and conclusions provided in the Loss Prevention Report.[6] (*Id.* 41:17-25.)

The Loss Prevention Report, among other things, contained memoranda summarizing the various interviews that Gallo conducted in his investigation.  It included W-2 Forms issued to three store managers, including Mayank Patel and Jittendra Patel, for the years 2004 and 2005

---

[6] The report, as a whole, was admitted into evidence for the limited purpose of demonstrating what information Laudermilk relied upon in making the termination decision. (6/8/10 Tr. 36:4-38:1.) At this point in its summary of the evidence presented at trial, the Court discusses the Loss Prevention Report for the purpose of elaborating on the basis of Laudermilk's decision to move forward with the franchise termination.  Certain portions of the report were, however, admitted into evidence for the truth of the matter asserted, and the Court cites to those specifically and separately admitted pages of the report insofar as they may be relevant to its discussion in other parts of this Opinion.

and observed that they "received salaries that were substantially less than the average salary of

$40,000.00." (Pl. Ex. 42 at DD 2691.) It listed various payments made on behalf of employees

of the Defendant franchises, including rent payments for both Mayank Patel and Jittendra Patel,

Mayank Patel's life insurance premium and plane ticket to India, and rent paid on behalf of

various other employees. (*Id.* at DD 2693.) It noted that these payments constituted "untaxed

compensation." (*Id.*) The Loss Prevention Report concluded as follows:

> Based on the above, both Shetal Shah and Samir Desai have caused false
> Employer's Quarterly Federal Tax Returns (Forms 941) for the periods
> ending 01/31/04 through 12/31/04 (4 quarters) and 6/30/05 through
> 6/30/06 (5 quarters) to be filed with the Internal Revenue Service in
> violation of Title 26 USC Section 7201, income tax evasion, as well as
> Title 26 USC Section 7206(1) subscribing to false Employer's Quarterly
> Federal Tax Returns.
>
> In addition, false deductions were taken on the corporate income tax
> returns of Strategic Venture Group, Inc. and East Brunswick Ventures, Inc.
> for the year 2004 in violation of Title 26 USC Section 7206(1).
>
> In the two year period examined, it appears that Shah and Desai
> compensated at least five employees approximately $33,830 without
> paying proper withholdings. Shah and Desai admit that they compensated
> these employees by paying for their rent, car payments, tuition, and
> vacations.
>
> Shah and Desai initially misrepresented the scope of this scheme to Loss
> Prevention. It was not until they were confronted with checks drawn on
> their corporate checking account evidencing the issue, that they admitted
> the full nature of their compensation technique.
>
> While no direct evidence was developed to support that underreporting is
> occurring in this network, we believe that the case noted by DFSM Simoes
> was cash payroll for the managers discussed in this case. We believe this
> cash comes from underreported sales. Even considering the car and rent
> payments made to these managers, Shah's managers are still compensated
> well below what is the norm. With managers earning half of what is the
> norm, one would expect payroll percentages to be less than what is
> normally seen. However, in the Shah network, payroll percentages are in

> line with what is deemed customary.  We believe that these payroll percentages are at the expected norm because sales are being underreported thus keeping the ratio of sales to payroll in line with each other.
>
> Loss Prevention recommends the Legal Department consider terminating Shetal Shah and Samir Desai for violating the obey all laws clause of their franchise agreement.

(*Id.* at DD 2695-2696.)


## II.      Termination of the Franchises

Laudermilk concluded that Defendants had committed tax fraud by paying expenses on behalf of employees, including, among others, $14,880 in rent, without reporting those amounts on the employees' W-2 forms declaring taxable income.  (6/8/10 Laudermilk Tr. 64:9-11, 65:18-24, 66:23-67:1.)  He testified that, as set forth in the Loss Prevention Report, Dunkin' had gathered evidence that the franchises did not report about $33,000 in wages to employees.  (*Id.* 77:20-78:2.)  Laudermilk determined that this conduct constituted an incurable breach of the franchisees' obligations under the Franchise Agreements and gave Dunkin' cause to terminate the franchises.  (*Id.* 66:14-68:16, 78:3-7.)  At trial, Laudermilk did admit that Dunkin' was, however, "not out-of-pocket one dime" as a result of the franchisee conduct that Dunkin' concluded amounted to tax fraud.  (*Id.* 70:14-17.)

In any event, some time after the decision to terminate was made, a letter from Dunkin's outside counsel was sent to Shetal Shah at each of the four stores advising that the franchises had defaulted under the Franchise Agreement and were therefore being terminated.  (Pl. Ex. 13.) The April 23, 2007 letter provides in relevant part as follows:

17

You are hereby notified of certain defaults under the Franchise Agreements between Dunkin' Donuts Franchised Restaurants LLC, successor in interest to Dunkin' Donuts Incorporated and Dunkin' Donuts LLC ("Dunkin'") and/or Baskin-Robbins Franchised Shops LLC, successor in interest to Baskin-Robbins USA, Co. and Baskin-Robbins USA LLC ("Baskin") (collectively "Franchisor") and the franchisees listed below, pursuant to which you operate a Dunkin' Donuts/Baskin-Robbins combo franchise and Dunkin' franchises . . .

* * *

It is also a violation of the Franchise Agreements to fail to comply with all applicable laws, rules, regulations, ordinances, and orders of public authorities (Paragraph 5.1.7) and to perform, directly or indirectly, any act injurious or prejudicial to the goodwill associated with Franchisor's Proprietary Marks and System.  (Paragraph 8.0.1.)

Based on a variety of evidence, Franchisor has concluded that you have violated applicable labor laws and tax laws by, among other things, failing to accurately report employee wages, failing to pay all payroll taxes due, and filing false tax returns.  Franchisor has concluded that you have used your franchised business to defraud the taxing authorities.  Among other things, you have paid wages to or on behalf of one or more of your employee without issuing W-2s or collecting payroll taxes on those monies.  You have also deducted those monies as business expenses for tax purposes.  Your actions are in breach of the Franchise Agreements in that they are injurious or prejudicial to the goodwill associated with Franchisor's proprietary marks and constitute a failure to comply promptly with all applicable laws.

Each of these breaches constitutes a default under Paragraph 9 of the Franchise Agreement and common law fraud.  Furthermore, pursuant to Paragraph 9.1.4 of the Franchise Agreement and as a matter of law, these breaches and fraud cannot be cured and are good cause for termination of the Franchise Agreements.

As permitted by Paragraph 9 of the Franchise Agreements, and for the reasons stated in this Notice of Default and Termination, Franchisor elects to and does hereby, without further notice, terminate the Franchise Agreements, effective sixty (60) days from receipt of this Notice, or as provided by applicable law.  Moreover, the termination of one Franchise Agreement also constitutes a default under the terms of all of your other Franchise Agreements, which cannot be cured as a matter of law and constitutes good cause for termination of those Franchise Agreements.

(Pl. Ex. 13.)

## III.    Evidence of Payments Not Reported as Wages

The following evidence was presented at trial with regard to Defendants' payment of

employee housing expenses, automobile expenses and other personal expenses:[7]

---

[7] During the trial, the Court received in evidence various exhibits consisting of charts listing expenses paid by the franchise businesses and claimed by them as tax deductions.  (The exhibits are Pl. Ex. 82 through Pl. Ex. 89.)  The summary exhibits were prepared by Meghi Mehta, employed by Dunkin' in its Loss Prevention Department, based on her May 2010 review of Defendants' general ledger records from QuickBooks, I-9s, W-2s and tax returns. (6/10/10 Tr. 118:13-14, 119:22-120:2.)

Defendants have objected to the admission of the summary exhibits Pl. Ex. 83 through Pl. Ex. 86 on the grounds that they deal payments made on behalf of Shah and Desai, which were not detailed in the Loss Prevention Report, and are therefore outside the scope of Dunkin's stated reasons for termination.  Defendants argue that Dunkin's answer to the interrogatory concerning its basis for terminating the franchises limited the facts in support of termination to those set forth in the Loss Prevention Report.  The Court, however, is not persuaded that payments made for Desai and Shah do not come within the noticed grounds for termination.  Although the Court limited Dunkin' to proving the validity of the franchise terminations based on the reasons expressed in the April 23, 2007 Notice of Termination and in its response to the interrogatory concerning its basis for termination, it specifically held that the proofs Dunkin' could present in support of those bases would *not* be limited to evidence in its possession at the time of termination.

Defendants alternatively argue that the Notice of Termination itself is not broad enough to cover those expenses, as it refers only to "failing to accurately report employee wages" and related tax violations, which cannot encompass payments made on behalf of business owners Shah and Desai.  This argument is likewise unpersuasive.  Shah and Desai worked at the stores 12-15 hours a day (6/21/10 Tr. 185:3-14, 191:7-13) and, moreover, fall within the tax code's definition of employee.  26 U.S.C. § 3401(c) (providing that term "employee" includes officer of

In 2004, SVG paid $16,180 in rent for two apartments: no. 712A North Village Drive, North Brunswick, New Jersey and 801A Birchwood Court, North Brunswick, New Jersey. (Pl. Ex. 88.)   The 2004 W-2 forms for eight of Defendants' employees listed 712A North Village Drive as the employee address. (Pl Ex. 82.)

The rental application for 712A North Village Drive, signed by Shah, states that he and his wife would be the tenants of the apartment. (Pl Ex. 72A.)  His and his wife's 2002 to 2005 tax returns, however, claim a different home address in Basking Ridge, New Jersey. (Pl. Ex. 35, 36, 37 and 38.)  Shah testified that he lived at 336 Penns Way, Basking Ridge from 1999 to 2008, when he moved to a different Basking Ridge address. (6/21/10 Tr. 103:1-16.)  The landlord for the apartment at 712A refused to renew the lease beyond its October 25, 2004 expiration, stating that people other than Shah and his wife and Desai and his wife had been living there, contrary to what was stated on the lease application. (Pl. Ex. 72C.)

Shah testified that employees of the franchise business resided at the apartments he rented (specifically, referring to 712A North Village Drive and 668 Village Drive South) and that they listed the apartment address on their W-4 form. (6/21/10 Tr. 106:13-21.)   He explained that the arrangement was temporary and was provided because the employees needed transitional housing. (*Id.* 106:22-107:9.) Shah conceded that tax forms reflected that employees resided in

---

a corporation).  The term "wages," which the Court discusses in more depth below, also includes payments made by the businesses on their behalf.  26 U.S.C. § 3401(a).

Defendants also argue for the exclusion of Pl. Ex. 82 because it lists employees whose W-2 addresses match the address of one of the apartments rented by the franchise businesses. This evidence is not "meaningless" as Defendants contend and indeed goes to the core of the wrongdoing alleged by Plaintiffs.

For these reasons, the Court denies Defendants' request to exclude the summary exhibits Pl. Ex. 82 through Pl. Ex. 89.

these apartments in some instances for two or three years but explained that this was a record-keeping mistake.  (*Id.* 107:10-22.)  Shah admitted that he did not pay payroll taxes on any of the rent paid for the apartments where employees lived.  (*Id.* 120:22-121:5.)

Shah testified that although the businesses paid for the rent of 712A North Village Drive, and various employees lived there, the businesses did not pay payroll taxes on the rent; rather, the rental payments were only deducted as business expenses.  (*Id.* 120:17-121:5.)  He stated that the apartment was needed because it had high-speed internet access necessary for training employees and because it would provide space for storing files.  (*Id.* 108:8-109:9, 141:13-20.)  He added that the items stored consisted of a "general folder regarding the training" and perhaps some other miscellaneous things such as shelves.  (*Id.* 141:21 - 142:5.)

SVG paid the rent for apartment 801A Birchwood Court in 2004 and 2005. (*Id.* 121:6-9 Govindbhai Patel, a baker working for the franchisees, was the named lessor of the apartment and resided there.  (*Id.* 122:1-14.)  Another employee, Dashratbahi Patel, also lived there.  (Pl. Ex. 82; 6/21/10 Tr. 122:15-19.)  According to Govindbhai Patel, who testified at trial, several of Defendants' employees lived in apartment 801A.  (6/21/10 Tr. 81:21-82:10; Pl. Ex. 42 at DD 2724.)  Shah testified that he did not view the rental payment made on the employees' behalf as taxable compensation.  (6/21/10 Tr. 122:20-123:14.)

EBV paid the 2005 and 2006 rent for an apartment located at 63B Rubin Street in South Brunswick, New Jersey.  (*Id.* 125:9-23.)  Shah acknowledged that two of his employees, Jittendra Patel and his wife, lived in that apartment, but stated that he did not view the rental payment made on their behalf as supplemental to their income.  Rather, he considered it a convenience to the business.  (*Id.* 125:24 - 126:18.)  Shah admitted that he did not pay payroll taxes on the rent

21

paid for Jittendra Patel and his wife.  (*Id.* 124:10-15.)

In 2005, SVG and EBV deducted $20,330.00 in rent paid for the apartments at 801A

Birchwood Court and 63B Rubin Street.  (Pl. Ex. 88; 6/21/10 Tr. 125:9-20.)  In 2006, EBV

deducted $10,486.25 for the apartment at 63B Rubin Street.  (Pl. Ex. 82; Pl. Ex. 42 at 2719.)

EFV deducted $2,817.93 in 2005 for monthly car lease payments made on behalf of

Mayank Patel, who managed the SVG store. (Pl. Ex. 87; Pl. Ex. 42 at 2716; 6/21/10 Tr. 157:3-

158:18.)  It also took deductions in 2006 in the amount of $7,916.44 for car lease payments made

for Mayank Patel and for Prashant Desai.   (P-87; 6/21/10 Tr. 158:6-160:8.)  Hemish Kapadia,

Defendants' accountant at the relevant time, testified that amounts listed on Plaintiff's Exhibit 87

as "auto lease M.P." were not included in payroll but rather claimed as a business expense.

(6/11/10 Tr. 90:2-7.)

Shah admitted in his testimony that one of the three then-existing franchisees, that is

SVG, EBV and/or EFV, paid for Mayank Patel's car lease, his airfare to India and the premium

on his life insurance policy.  (6/21/10 Tr. 198:1 - 201:10.)  EBV deducted the $1,135 payment for

the airline ticket on its 2005 tax return.  (Pl. Ex. 89.)  At trial, Shah conceded that the ticket

purchase was a wedding gift to Mayank Patel.  (6/21/10 198:22-199:5.)  EFV deducted the $790

payment for Mayank Patel's term life insurance on its 2005 tax return. (Pl. Ex. 89.)

He also admitted that one of the franchises made a $5,100 tuition payment to the

Rochester Institute of Technology on behalf of Bhavin Shah, explaining that he had done

valuable computer programming work for Defendants. (6/21/10 Tr. 202:23- 203:14, 205:8-

207:10.)

EFV made payments to the "Learning Experience" in the amount of $3,675 in 2005 and $10.645 in 2006 for the daycare expenses of Desai's young son.  (Pl. Ex. 85; 6/21/10 Tr. 161:18 - 162:23.)  EFV's general ledger listed the payments in the category of "Training Class/On-line."  (Pl. Ex. 85.)  They were deducted as business expenses on the corporate tax returns.  (*Id.*)

EFV and EBV made payments to the "Flemington Eye Center" in 2005 and 2006 for Shah's laser eye surgery.  (Pl. Ex. 86.)  They made combined total payments of $1,560 in 2005 and $1,040 in 2006.  (*Id.*)  The franchise businesses' general ledgers listed the payments in the category of "Professional & Legal."  (*Id.*)  They were deducted as business expenses on the corporate tax returns.  (*Id.*)

EFV made $70,170.54 in payments to a company called North Oaks Management, LLC in 2005 and 2006.  (Pl. Ex. 72.)  This company was owned by the wives of Shah and Desai and engaged in the business of managing leases and other real estate. (6/21/10 Tr. 130:19 -131:11.)  The payments were classified as "additional rent expenses" in the general ledgers.  (Pl. Ex. 72 at QB 840 and QB914.)  Shah testified, however, that the payments made to North Oaks Management were for "a management fee and registration fee," not for any property leased by EFV.  (*Id.* 136:20 - 137:3.)


## IV.   Additional Testimony

At trial, the Court heard testimony from a number of witnesses, including Gallo and Laudermilk.  It also heard testimony from Hemish Kapadia and Michael Vernoia, Defendants' accountants at different times relevant to this suit, from franchise employee Govindbhai Patel, from franchise owners Shetal Shah and Samir Desai, and others.  Much of the germane testimony

given has been incorporated into the foregoing summary of evidence.  The Court will highlight additional relevant portions of testimony given by Kapadia, Vernoia and Shah.

Hemish Kapadia became a certified public accountant in 2006.  (6/11/10 Tr. 41:3-5.)  At the relevant time, he worked for Phyphar, Inc., his father's accounting firm, where he had been employed since 2002. (*Id.* 43:1-10.)  Phyphar, Inc. prepared the 1120S tax returns for SVG, EBV and EFV in 2004 and 2005.  It also prepared the personal tax returns of Shah and Desai for those years.  (Pl. Ex. 16 through Pl. Ex. 37.)  In 2002, Kapadia became an enrolled agent with the IRS, which he described as a designation demonstrating that one had taken a competency exam concerning tax law.  (6/11/10 Tr. 41:6-20.)

Kapadia was interviewed by Gallo in September 2006.  (6/11/10 Tr. 82:17-21.)  He recounted at trial that Gallo informed him that the franchise businesses were paying employee rent.  (*Id.* 82:20-23.)  He contacted Shah and advised him that based on that information, previously filed returns should be amended and that the 2005 returns, which had been drafted but not yet filed, should also be revised to reflect employee rent payments. (*Id.* 83:6-84:1.) According to Kapadia's testimony, Shah instructed him to file the 2005 returns as drafted and did not direct that prior returns be amended.  (*Id.* 84:2-8.)  Kapadia testified that it was his understanding that a corporation's payment of rental expenses for its employees may be deducted as a business expense, but that the amounts paid in rent are subject to payroll tax.  (*Id.* 6/11/10 56:11-13.)  He stated that from 2002 to 2005 he raised the issue of the franchises' rental of apartments, and Shah informed him that the housing was used for storage of materials and for occasional stays by employees.  (*Id.* 6/11/10 54:12 - 56:5.)

Kapadia testified that Shah never told him that the apartments for which Shah was paying rent were used as employee residences.  (*Id.* 56:6-8.)  He further testified that had Shah told him, Kapadia would have advised that payroll returns should be amended because employee housing is subject to payroll taxes. (*Id.* 56:9-13.)  According to Kapadia, Shah first disclosed to him that the businesses were making various personal employee expenses when Shah sent him an April 2007 email attempting to justify the payments. (6/11/10 Tr. 56:6-8; 6/21/10 Tr. 23:15-32:13; Pl. Ex. 46.)

Michael Vernoia is an accountant retained by Defendants in 2008. (6/22/10 Tr. 95:17-96:9.)  He was asked by Defendants to prepare their 2006 personal and corporate tax returns, which were overdue.  (6/22/10 Tr. 96:10-97:2.)  Vernoia testified that he prepared the returns based on documents and information provided to him by Shah.  (*Id.* 97:3 - 98:5.)  He stated that he relied largely on QuickBooks general ledger files provided by Shah and believed them to be accurate.  (*Id.* 101:2-19.)

Shah received an associate's degree in accounting from Bergen Community College in 1993 and a bachelor's degree in finance from Rutgers University in 1997.  (6/21/10 Tr. 89:8-10, 179:23-180:2.)  Between 1997 and 2002, prior to becoming a Dunkin' franchisee, Shah held positions in the financing industry, working at CIT Financial and Prudential. (*Id.* 89:11-24.)  He handled the bookkeeping for the franchise companies, personally inputting all of the corporate expenses into the general ledgers for each shop, using a QuickBooks software program, and he coordinated the taxation issues with the companies' outside accountants.  (6/21/10 Tr. 93:2-95:6; 6/23/10 Tr. 77:2-11.)  Shah knew the companies had to pay payroll taxes on all payments made to employees.  (6/21/10 Tr. 97:6-9; 100:13-18; 101:3-102:5.)

25

Shah explained that he did not pay payroll taxes on the amounts paid in rent for apartments where employees resided, because he did not view the rental payments as compensation to them.  (*Id.* 121:2-5, 126:8-127:15.)  He also stated that he treated the apartment rental payments as business expenses and not as employee compensation based on the advice of his accountants, either Hemish Kapadia or Sushil Kapadia, his father.  (*Id.* 112:1-8.)  As set forth above, Shah acknowledged throughout his testimony that the businesses did pay various expenses on behalf of employees, but testified that he believed these various payments were deductible business expenses and that the franchisees deducted them without any intention of evading the payment of taxes.  (*Id.* 199:24 -201:3, 204:20-205:7, 207:11-19.)

## DISCUSSION

### I.      Breach of Contract

Dunkin' has requested that the Court give its imprimatur of Dunkin's termination of the Defendants' franchises. To determine whether Dunkin' is entitled to a declaratory judgment that the termination of the franchises is valid and effective, the Court must resolve the question of whether Dunkin's termination of the Defendant franchises complied with New Jersey Franchise Practices Act.  As set forth in the Legal Standards section of this Opinion, proper termination of a franchise requires good cause, written notice by the franchisor setting forth reasons for the termination and at least 60 days' advance notice of the termination.  *N.J.S.A.* 56:10-5. Good cause for termination is established when the franchisor demonstrates that the franchisee has failed to substantially comply with its contractual obligations.  *N.J.S.A.* 56:10-5.  Interpreting New Jersey law, the United States District Court for the District of New Jersey has held that

"substantial compliance - at a minimum - requires that the franchisee refrain from acting in direct defiance of a term of the Agreement."  *Gen. Motors. Corp. v. The New A.C. Chevrolet, Inc.*, 91 F.Supp.2d 733, 740 (D.N.J. 2000), *aff'd*, 263 F.3d 296 (3d Cir. 2001).

Dunkin' has argued that Defendants' franchises were properly and justifiably terminated for their breach of the Franchise Agreements' obey all laws clause.  The clause, though quoted above, bears repeating here.  It states:

> FRANCHISEE shall comply with all civil and criminal laws, ordinances, rules, regulations and orders of public authorities pertaining to the maintenance and operation of the Unit, including, but not limited to, those relating to health, safety, sanitation, employment, environmental regulation and taxation.

(Franchise Agreement ¶ 5.1.7.)  They further contend that this breach triggered their right of termination under Paragraph 9 of the Franchise Agreement, and more specifically, as to SVG, EBV and EFV under Paragraph 9.0.2 and as to MRV under Paragraph 9.0.4.  These provisions also bear repeating.  They state that the Franchisee will be in default if:

•   FRANCHISEE is convicted or pleads guilty or 'nolo contendere' to a felony, a crime involving moral turpitude, or any other crime or offense that FRANCHISOR believes is injurious to the System(s), the Proprietary Marks or the goodwill associated therewith, or if FRANCHISOR **has proof** that the FRANCHISEE has committed such a felony, crime or offense.  (*Id.*, ¶ 9.0.2) (emphasis added).

•   any other franchise agreement between FRANCHISEE and FRANCHISOR or any affiliated entity is terminated by reason of FRANCHISEE's default thereunder. (*Id.*, ¶ 9.0.4.)

27

Default on either of these bases deprives the franchisee of any period to cure its wrongdoing. (*Id.*, ¶ 9.1.4.)

Plaintiffs premise their claim that the obey all laws clause was breached on the theory that Defendants did not comply with payroll tax laws in compensating employees of the franchises. As applied to this case, the principles of the Franchise Practices Act require the Court to determine (1) whether Plaintiffs have proven that Defendants failed to comply with payroll tax laws in breach of the Franchise Agreement, (2) whether the breach amounts to a lack of substantial compliance with the contract, and (3) whether such breach, that is, Dunkin's reason for termination, was adequately communicated to Defendants in compliance with the Franchise Practices Act.

### A.     Analytical Framework

Before delving into its analysis of the validity of the terminations, the Court must clarify that, contrary to the arguments presented by both parties in their briefing of proposed findings of fact and conclusions of law, this case is not about establishing that Defendants committed felony tax evasion or some other crime.  In pursuing their theory of payroll tax law violations, Plaintiffs have attempted to demonstrate that the evidence developed at trial proves that Defendants violated two criminal tax statutes, 26 U.S.C. § 7201 for attempted tax evasion and 26 U.S.C. § 7206(1) for filing false tax documents.  This approach is overly ambitious and, indeed, unnecessary in the context of the sole claim at issue in this lawsuit – whether the termination of Defendant franchises is valid under the New Jersey Franchise Practices Act.

The Franchise Agreement's obey all laws clause, which frames this question, does not require that franchisees merely refrain from conduct that rises to the level of a felony tax offense.

28

By its terms, it requires compliance with all civil and criminal tax laws, regardless of whether a

violation of the law may be penalized.  Of course, to effect the *immediate* termination of the

Defendant franchises per Dunkin's April 23, 2007 Notice of Termination, Dunkin' must also

demonstrate that Defendants' breach constituted a non-curable default, in this case under

Paragraph 9.0.2 of the Franchise Agreement.  Here, however, the Court must be guided by

Franchise Agreement, not by principles of criminal law.  The default provision on which

Plaintiffs rely as to SVG, EBV and EFV authorizes the Franchisor to terminate the Franchise

Agreement without a cure period if it "has proof" that Franchisee committed a felony.   Nothing

in the Franchise Agreement, however, suggests that the "proof" must rise to the level required to

support a criminal conviction.  For purposes of these civil proceedings, the Court concludes that

Paragraph 9.0.2 is satisfied if Dunkin' proved at trial that it was in possession of proof sufficient

to establish a criminal violation by a preponderance of the evidence.  In the Court's opinion,

Dunkin' need not prove beyond a reasonable doubt that Defendants committed felony tax

offenses in order to avail itself of contractual remedies.  In other words, the issue in this case is

not whether the evidence is sufficient to impose criminal penalties on Defendants. The issue,

rather, is whether Defendants' failure to treat various payments made on behalf of their

employees as employee wages constituted a substantial failure to comply with payroll tax laws,

in violation of the obey all laws clause, and justified Dunkin's exercise of its contractual

termination rights.  These proceedings will not be distorted into a quasi-criminal action.

### B.      Non-Curable Default Under Franchise Agreement

Plaintiffs have presented ample evidence to demonstrate that Defendants SVG, EBV and

EFV inappropriately failed to treat various payments made by the businesses for their employees

as wages and in so doing failed to comply with payroll tax laws.  There is no dispute that the corporate Defendants SVG, EBV and EFV paid various expenses on behalf of their employees in 2004, 2005 and 2006, including rent, car leases, life insurance and airfare.  These payments fall within the tax code's definition of wages.  Title 26 U.S.C. § 3401(a) provides that "wages" means all remuneration (other than fees paid to a public official) for services performed by an employee for his employer, including the cash value of all remuneration (including benefits) paid in any medium other than cash.  26 U.S.C. § 3401(a).  "'Wages' includes any amount includible in gross income of an employee under section 409A."  *Id.*  Under the tax code, "gross income means all income from whatever source derived, including (but not limited to) . . . compensation for services, including fees, commissions, fringe benefits, and similar items; [and] gross income derived from business."  26 U.S.C. § 61(a) and (b).  There is also no dispute that Defendants did not log these payments as wages on either their corporate records or in their tax filings, as the amounts paid for expenses such as rent were not reported as the employees' W-2 forms or on the employer's 941 forms.  Shah indeed admitted that he did not consider the payments to constitute compensation.

The law requires employers to deduct and withhold federal income tax on wages paid to employees. 26 U.S.C. § 3402(a)(1).  Employers must also withhold Social Security and Medicare taxes from the employees' wages in the amount of both the employees' and the employer's portion of responsibility for these taxes.  26 U.S.C. §§ 3101(a) and (b), 3102(a), 3111(a) and (b).  Employers required to make returns of income taxes and Federal Insurance Contributions Act ("FICA") taxes (i.e., Social Security and Medicare) that the employer withheld from employee wages must file a quarterly Form 941 with the IRS which reports taxable wages.  26 C.F.R. §

31.6011(a)-1T(a)(1) and 4T(a)(1).  The accurate reporting of wages on the Form 941 is necessary

to compute payroll tax correctly.  *See* 26 U.S.C. §§ 3101(a) and (b), 3102(a), 3111(a) and (b).

Defendants' admitted failure to include the employee car, rental and other payments of personal

expenses in the payroll reporting to the IRS and related failure to withhold required taxes on

those amounts certainly runs afoul of various federal taxation obligations.  This conduct

constitutes a breach of the Franchise Agreements' obey all laws clause.

Dunkin' has also demonstrated that these payroll tax violations, that is failure to report

employee payments as wages on W-2 and 941 forms, and failure to withhold adequate amounts

of payroll tax, amounted to a non-curable default of the Franchise Agreements by SVG, EBV and

EFV.  The evidence is clear that through the information gathered in its investigation of

Defendants, Dunkin had proof demonstrating by preponderance of the evidence that these three

franchisees had committed the felony tax offense of attempted tax evasion.  Attempted tax

evasion in violation of Title 26 U.S.C. § 7201, consists of the following elements: (1) the

existence of a tax deficiency; (2) the affirmative act constituting an attempted evasion of payment

of taxes; and (3) willfulness.  *Sansone v. United States*, 380 U.S. 343, 351 (1965).  Dunkin'

demonstrated at trial that its decision to terminate the SVG, EBV and EFV franchises was based

on proof that went towards each of these elements.  The Court will review the evidence

presented.

A tax deficiency exists when tax is due and owing.  *United States v. McGill*, 964 F.2d

222, 229 (3d Cir. 1992).  An "affirmative act" under section 7201 "is anything done to mislead

the government or conceal funds to avoid payment of an admitted and accurate deficiency. The

offense is complete when a single willful act of evasion has occurred."  *United States v. McGill*,

964 F.2d 22, 230 (3d Cir. 1992) (citations omitted).  The filing of a false return will satisfy the

affirmative act element.  *Id.*   Plaintiffs presented evidence that for the years 2004-2006,

Defendants failed to report $64,755.62 in wages paid to employees other than Shah and Desai.

This, of course, resulted in insufficient payroll tax being withheld and then remitted to the federal

government. Dunkin' also had proof of false filings, such as W-2s and 941s, which were

inaccurate in their omission of amounts paid in employee compensation.

As for willfulness, Dunkin' also had reason to believe that the franchise businesses'

improper categorization of employee payments and related avoidance of tax liabilities thereby

was a "voluntary, intentional violation of a known legal duty."  *Cheek v. United States*, 498 U.S.

192, 201 (1991); *see also United States v. Ashfield*, 735 F.2d 101, 105 (holding same as to

violations of section 7201).  The law is clear that an inference of willfulness, based on

circumstantial evidence, suffices.  *Ashfield*, 735 F.2d at 105.  The Third Circuit has observed that

willfulness can be inferred from conduct such as the taxpayer's pattern of underreporting income

and failure to include all income on his books and records.  *Id.*; *see also United States v. Frank*,

245 F.2d 284, 287-88 (3d Cir.1957) (proof of a consistent pattern of underreporting "is itself

enough" to sustain a jury finding of willful tax evasion).  The Supreme Court has given the

following guidance on examples of conduct from which an "affirmative willful attempt" to evade

tax obligations may be inferred:

> By way of illustration, and not by way of limitation, we would think
> affirmative willful attempt may be inferred from conduct such as keeping a
> double set of books, making false entries of alterations, or false invoices or
> documents, destruction of books or records, concealment of assets or
> covering up sources of income, handling of one's affairs to avoid making
> the records usual in transactions of the kind, and any conduct, the likely
> effect of which would be to mislead or to conceal.

*Spies v. United States*, 317 U.S. 492, 499 (1943). Gallo conducted interviews with both Shah and

Kapadia, the franchisees' accountant.  The substance and development of these interviews gave

Dunkin' sufficient basis to infer that the failure by the franchises to report employee rent, car and

other personal payments as wages was a deliberate attempt to disguise the payments.

 Based on the various tax documents Dunkin' gathered in its investigation, together with

the information related to the payment of employee expenses, Dunkin' also had proof

establishing by a preponderance of the evidence that SVG, EBV and EFV had filed false tax

documents, a felony under 26 U.S.C. § 7206.  A violation of this provision consists of the

following elements: (1) defendant made and subscribed a return, statement or other document

which was false as to a material matter; (2) the a return, statement or other document contained a

written declaration that it was made under the penalties of perjury; (3) defendant did not believe

that the a return, statement or other document was true and correct as to every material matter;

and (4) defendant falsely subscribed to the return, statement or other document willfully, with the

specific intent to violate the law.  *United States v. Gollapudi*, 130 F.3d 66, 71-72 (3d Cir. 1997)

(citing *United States v. Bishop*, 412 U.S. 346, 350 (9th Cir. 1973)).  An item is material if its

inclusion in a tax return is necessary for a correct computation of tax.  *Siravo v. United States*,

377 F.2d 469, 472 (1st Cir. 1976).

 Having found that Plaintiffs demonstrated that three of the four franchisees at issue -

SVG, EBV and EFV - breached the Franchise Agreements' obey all laws clause by failing to

comply with payroll tax laws, and moreover had proof that in so doing these franchises had

defaulted on their contractual obligations in a non-curable manner, the Court must now turn its

attention to Defendant MRV.

Plaintiffs have not argued that MRV breached the Franchise Agreement's "obey all laws" clause. Indeed, the Court observes that Plaintiffs did not submit evidence at trial of any tax law violations committed by MRV on or before April 2007, when the termination letter was sent to the four franchise businesses.  Instead, Dunkin maintains that, at the time of termination, MRV was in default under Paragraph 9.0.4, the Franchise Agreement's cross-defaults provision. Dunkin', however, has not proven that MRV is in default under that provision.  By its terms, the cross-defaults provision applies when the "Franchisee" defaults under any other franchise agreement it may have with Dunkin'.  The term "Franchisee," used throughout the Franchise Agreement and specifically in the cross-defaults provision, has a specific and express meaning ascribed to it.  The Franchisee Agreement binding MRV identifies the "Franchisee"  as "Milltown Ryder Ventures, Inc., a New Jersey Corporation."  The term "Franchisee" is defined as "the person(s) or entity who signed this Agreement, which may include a sole proprietor, all partners of a general partnership, a corporation or a limited liability company ("LLC")." (Franchise Agreement, Definitions.)   That definition does not include the principals or owners of the corporation.  The MRV Franchise Agreement, signed by Shah as President of MRV, was clearly signed solely in the name of the corporate entity "Milltown Ryder Ventures, Inc." Dunkin' conflates MRV shareholders Shah and Desai with the franchisee corporation for the apparent purpose of justifying MRV's termination based on the defaults of SVG, EBV and EFV, other franchisee corporations also owned by Shah and Desai.  This effort is simply unsupported by the Franchise Agreement it entered into with MRV.

Thus, the Court concludes that Dunkin' cannot and has not demonstrated that it is entitled to exercise its contractual termination rights as against MRV.  The lack of any support in the

Franchise Agreement for the MRV termination at issue in this lawsuit obviates the need to

evaluate the existence of good cause.  Dunkin's compliance with the Franchise Practices Act's

termination requirements will, however, be discussed as to the other three Defendant franchisees.

### C.      Propriety of Termination Under New Jersey Franchise Practices Act

#### 1.      Good Cause

The Court is further satisfied that Defendants' non-compliance with payroll tax laws

constituted a material breach of the contract, that is, good cause for termination under the

Franchise Practices Act.  "Good cause" under the statute is "limited to the failure of a franchisee

substantially to comply with the requirements of the franchise agreements."  *Dunkin' Donuts of*

*Am., Inc. v. Middletown Donut Corp.*, 100 N.J. 166, 178 (1985).  Put somewhat differently, good

cause means that the franchisee materially breached the franchise agreement.  *Gen. Motors Corp.*

*v. New A.C. Chevrolet, Inc.*, 263 F.3d at 317 n.8.   The evidence overwhelmingly shows that the

payroll violations were not inadvertent or isolated mistakes, or that they were *de minimis* as

Defendants' counsel has implicitly maintained in the various arguments raised about the amount

of tax liability at issue.  Rather, the evidence shows that the failure to report certain payments as

employee wages and to pay taxes thereon was part of a calculated effort by the franchises,

through the actions of the corporate entities' co-owner Shah, to disguise the true nature of the

payments.

Shah acknowledged making the rent, airfare, car lease and other payments for his

employees' benefit and thus was clearly aware of the use to which this money was being put.  He

also testified that he himself prepared and kept the corporate records of these payments. Shah

entered the data regarding these payments in ledgers created with the QuickBooks computer

program, chose to categorize the payments as various business expenses rather than employee

compensation and determined how the payments would be expensed.  He provided this

information to the franchises' accountant, knowing that tax documents would be prepared based

on the ledgers.

Apart from Shah's own knowledge of the nature of the payments, his interactions with his

accountants further indicate the reckless, if not intentional, violation of tax law obligations and

thus the materiality of the breach.  When Kapadia inquired about the rent payments made by the

business for various residential addresses, Shah did not fully disclose the nature of the rentals.

Kapadia testified that he repeatedly asked Shah about the apartment rental expense and that Shah

never informed him, until April 2007 - long after the tax documents prepared by Kapadia for the

business had been filed -  that the apartments were used as employee housing.  Kapadia further

testified that he specifically addressed the topic with Shah after his September 2006 conversation

with Gallo, during which Kapadia received information about the residential use of the

apartments by employees.  Kapadia asserts that he advised Shah that, if Gallo's information was

accurate, the not-yet-filed 2005 returns would have to be revised and previously-filed documents

would have to be amended to reflect additional employee compensation.  Even then, according to

Kapadia, Shah did not disclose the true nature of the apartment rentals and instructed the

inaccurate 2005 returns to be filed as drafted.  After parting ways with Kapadia, Shah continued

to provide the same kind of information to his new accountant, Vernoia, for the preparation of

the 2006 tax return, indicating a continuing pattern of concealment and making misleading

entries in corporate records.

Other evidence indicates a pattern of knowingly mischaracterizing franchise expenses and thus further belies Defendants' efforts to minimize the importance and impact of their breach. For example, the payment made by the businesses for the daycare expense of Desai's son was classified as "Training Class/On-Line."  Shah booked his laser eye surgery as "Professional & Legal Fees - Other" and the payments to North Oaks Management as "Rent-Additional," even though no property owned by North Oaks Management was in fact rented by the businesses. The Court further notes Shah's failure to respond to Gallo's inquiries about personal expense payments for employees in a complete and forthcoming manner.  In an early interview during the investigation, Shah admitted to paying Mayank Patel's car lease and airfare and Jittendra Patel's rent.  However, at that time and again thereafter, he denied paying any other employee personal expenses, until confronted by Gallo with evidence of the rental of an apartment for Govindbhai Patel.  Additionally, Shah's college degrees in accounting and finance, experience in the finance industry and business ownership all point to a level of knowledge and sophistication which, together with Kapadia's testimony and Shah's own misleading categorization of the expenses in the corporate records, render his testimony that he believed in good faith that the payments were for the benefit of the business and not employee remuneration completely implausible.  The Court will not credit his self-serving assertion that he did not intend to evade taxes by failing to treat and report the rent, car lease and other payments of employees' personal expenses as wages.

In short, Dunkin' presented more than adequate evidence to demonstrate that SVG, EBV and EFV handled employee compensation in a persistent and knowingly inappropriate manner, in contravention of federal tax laws, and as such failed to substantially comply with their contractual obligation to obey all laws, particularly those related to taxation.  Dunkin' had good

cause for terminating these franchises.

2.      Written Notice

The evidence clearly supports the Franchise Practices Act's requirement of providing a franchisee with written notice of termination at least 60 days in advance of the date it will take effect.  Dunkin' notified the franchisees by letter dated April 23, 2007 of termination to take effect 60 days from the date of the letter.  The letter provided various reasons for the termination, including the reason Plaintiffs have proven at trial: breaching the obey all laws clause by "violat[ing] applicable labor and tax laws by, among other things, failing to accurately report employee wages, failing to pay all payroll taxes due, and filing false tax returns."  (Pl. Ex. 13 at 2.)  Indeed, the letter goes on to elaborate on the basis for this  terminable default:

> Among other things, you have paid wages to or on behalf of one of more of your employees without issuing W-2s or collecting payroll taxes on those monies.  You have also deducted those monies as business expenses for tax purposes.

(*Id.*)

**D.      Defendants' Rebuttal on the Breach of Contract Claim**

Defendants argue that regardless of whether Plaintiffs are able to prove these tax violations, they cannot prevail on their claim for two reasons.  One, Defendants point out that the language of the Franchise Agreements is clear that the failure to comply with the law must relate to the "maintenance and operation" of the unit, and they contend that this requirement is not met. Two, Defendants maintain that Plaintiffs have failed to establish damages, a critical element of a breach of contract claim.  The Court finds neither argument to hold merit.

38

First, Defendants' attempt to distort the contract language is unavailing.  Defendants argue that Laudermilk's "admission" at his deposition that the tax issues do not "narrowly speaking relate to the operation of Defendants' stores" is dispositive of the meaning and application of the contract language.  (Def. Proposed Findings of Fact at 46, citing Laudermilk Dep. Tr. 90:20-91:9.)  Initially, the Court rules that for the sake of completeness, the Laudermilk deposition excerpt to be read into the record of trial as Defendants' Exhibit 77 must include the entire colloquy on this matter, that is, Laudermilk's interpretation of the "maintenance and operation" language.  Thus, the Court admits as Defendants' Exhibit 77 the portion of Laudermilk's May 27, 2010 deposition transcript from page 90, line 9 to page 94, line 2.  The entire deposition colloquy on this issue reveals that Laudermilk stated that the violations do impact the businesses.

Aside from this point regarding Laudermilk's complete response to the deposition questions on the topic, it is the Court's interpretation of the contract language which controls. Under the law of Massachusetts, which applies to the Franchise Agreements, the interpretation of a contract is ordinarily a question of law.  *Den Norske Bank AS v. First Nat. Bank of Boston*, 75 F.3d 49, 52 (1st Cir.1996). However, "[if] the contract language is ambiguous, on its face or as applied, contract meaning normally becomes a matter for the fact finder."  *Id.* Whether a contractual ambiguity exists is a question of law for the court. *Wyner v. N.  Am. Specialty Ins. Co.*, 78 F.3d 752, 754 (1st Cir.1996).  In this case, the Court discerns no ambiguity in the language compelling franchisees to obey all laws "pertaining to the maintenance and operation of the Unit, including, but not limited to, those relating to health, safety, sanitation, employment, environmental regulation and taxation."  (Franchise Agreement ¶ 5.1.7.)   A contract is

39

considered ambiguous where the terms used can reasonably support differing interpretations, but it is not rendered ambiguous simply because the parties may disagree about its meaning. *BayBank Middlesex v. 1200 Beacon Properties, Inc.*, 760 F.Supp. 957, 963 (D.Mass.1991). Here, it is clear that the phrase "pertaining to the maintenance and operation" in the  "obey all laws" clause of the Franchise Agreement has the effect of limiting the contractual obligation on franchisees to obey the law insofar as their performance as Dunkin' franchisees is concerned.  It has the effect of distinguishing the contracting party's legal compliance with tax laws relating to the Dunkin' franchise business that is the subject of the Franchise Agreement from violations that the contracting party may commit in another context, such as in the operation of a separate business venture.

In this case, the tax violations committed by Defendants clearly fall within the purview of the Franchise Agreements' "obey all laws" clause.  They relate to the improper characterization on corporate records of payments made on behalf of the franchises' employees and to the resulting inaccurate reporting of employee wages to the IRS and insufficient withholding of payroll taxes.  The franchises' failure to comply with tax laws, in short, is rooted in the compensation of employees of the Dunkin' franchises' retail shops and thus plainly pertains to the operation and maintenance of the Dunkin' retail units at issue in the Franchise Agreements.

Second, Defendants' argument as to lack of damages is, to put it bluntly, a red herring. This is a case about obtaining judicial approval of Dunkin's termination of four of its franchisees. The Franchise Agreements clearly state:

> If Franchisee fails to cure any default within the applicable period
> following notice from Franchisor, Franchisor may, in addition to all other
> remedies at law or in equity or as otherwise set forth in this Agreement,

40

> immediately terminate this Agreement . . . Upon any termination or
> expiration of this Agreement all right of Franchisee to use the Proprietary
> Marks and the System(s) and to operate the Unit under the Propriety
> Marks shall terminate . . .

(Franchise Agreement ¶ 9.4.)  The Franchise Agreement then goes on to list, in detail, various

post-termination obligations of the Franchisee, including immediately ceasing to operate the

franchised unit and to represent itself to the public as a Dunkin' franchisee and selling to the

Franchisor all equipment, signs, fixtures and the like used in connection with the franchised unit.

(*Id.* ¶¶ 9.4.2 and 9.4.4.)

As discussed at length earlier in this opinion, to demonstrate that the termination

complies with the Franchise Practices Act, Plaintiffs must prove that the franchisees failed to

substantially comply with their obligations under the Franchise Agreement.  The necessity of

proving a material breach of the contract does not transform the claim pursued by Dunkin' into

one for monetary relief.  Plaintiffs, in fact, are not seeking damages.  Indeed, the Court notes that

Defendants themselves have raised the equitable doctrine of unclean hands as barring Plaintiffs

from relief.  This reflects their tacit recognition that this action, though premised on Defendants'

breach of the Franchise Agreements, is equitable in nature.


## II.    Defendants' Unclean Hands Argument

Defendants have asked the Court to deny Dunkin' relief, on the grounds that it has acted

with unclean hands in terminating the Franchise Agreements as well as bringing this lawsuit.

They maintain that Dunkin's unclean hands consists of its termination of the franchises and

subsequent pursuit of a breach of contract claim based, in part, on its view that the franchisees

had underreported sales and had failed to maintain adequate records.  They argue that these two

stated grounds for termination were knowingly false, yet Dunkin' relied on them in the notice of

termination.  It appears to the Court, however, that the only support offered by Defendants for

this position is (1) Dunkin's ultimate decision not to try its breach of contract claim on a theory

of underreporting despite having actively pursued the theory in discovery and throughout

litigation and (2) the lack of a conclusive determination in the Loss Prevention Report that the

evidence gathered supported underreporting.   The Court finds neither of these arguments

availing to Defendants.

 The unclean hands doctrine may apply to bar relief only when the applicant for relief has

committed some misconduct or unconscionable act necessarily related to the equitable relief

sought by the applicant.  *New Valley Corp. V. Corp. Prop. Assoc. 2&3*, 181 F.3d 517, 525 (3d

Cir. 1999).  This case has traveled a long and somewhat tortured path to trial, a history which is

documented in the record of this case and which the Court need not recount here.  The Court is of

the opinion that, in light of all facts and circumstances, Dunkin's strategic decision to abandon a

claim before trial does not necessarily indicate misconduct.  Nor have Defendants demonstrated

to the Court that it was unconscionable for Dunkin' to give underreporting of sales as one of its

stated reasons for terminations of the franchises.  The Loss Prevention Report does not, in point

of fact, reject the underreporting theory but rather notes the lack of direct evidence developed to

support it.

 Defendants also maintain that Plaintiffs have unclean hands based on their entry into a

Store Development Agreement with MRV and acceptance of a franchising fee at a time when the

other three franchises owned and operated by Shah and Desai were in the process of investigation

for termination.  The Court will not countenance this argument, as it has clearly precluded all matters pertaining to the MRV Store Development Agreement from this trial, including specifically as the Store Development Agreement may relate to the doctrine of unclean hands. (*See* 3/22/10 Order Docket Entry 141; 6/8/10 Mot. in Limine Tr. 73:16-21.)  Moreover, consistent with its prior holdings, it will not countenance any argument premised on Dunkin's alleged motivation in terminating the subject franchises.  (6/8/10 Mot. In Limine  Tr. 52:24-60:24.)

In short, the Court, in the exercise of its discretion, will not apply the doctrine of unclean hands to bar Dunkin' from the relief it seeks.  *New Valley Corp.*, 181 F.3d at 525 (holding that application of equitable doctrine of unclean hands is a matter left to discretion of trial court).

### III.    Lanham Act Claims

Counts II-IV of the Complaint allege unauthorized use of Dunkin's intellectual property in violation of the Lanham Act.  The Court includes these claims in it discussion for the purpose of noting the lack of any real dispute to resolve, in light of the representations made by the parties.  Plaintiffs conceded that Defendants are authorized to use the Dunkin' trademarks unless and until there is a judicial determination that their franchises have been properly and effectively terminated.  (6/6/10 Tr. 46:11-48:7.)  Defendants have represented that they will voluntarily cease using Dunkin's trademarks and trade dress if Dunkin' prevails on the franchise termination claim.  (Def. Proposed Findings of Fact at 48.) As set forth above, Dunkin' has prevailed on the termination claim as to SVG, EBV amd EFV but not as to MRV.

IV.     **Attorneys' Fees and Costs**

Both Dunkin' and Defendants have applied to the Court for an award of attorneys' fees

and costs.  Dunkin' bases its application on the Franchise Agreements, which provide that

"FRANCHISEE shall pay to FRANCHISOR all damages, costs, and expenses, including but not

limited to, reasonable investigation and attorney's fees and other reasonable expenses and costs

such as travel costs and payroll expenses for FRANCHISOR's employees, incurred in obtaining

injunctive or other relief for the enforcement of any provisions of this Section 9 [which concerns

default]. (Franchise Agreement ¶ 9.4.8.)  Dunkin' has proven, consistent with the foregoing

discussion, that its termination of the franchises operated by SVG, EBV and EFV was justified

and that it may pursue its contractual rights under the Franchise Agreements with those entities.

It has not, however, made any demonstration that it is entitled to an injunction or other similar

relief in which the Court would enforce Dunkin's termination rights.  Thus, the Court concludes

that Plaintiffs may not recover attorneys' fees pursuant to the Franchise Agreements' fee shifting

provision.[8]

Defendants ask for counsel fees under the Franchise Practices Act, which authorizes such

an award to a franchisee that prevails on its claims against a franchisor for violation of the

statute. *N.J.S.A.* 56:10-10.  By its terms, the provision applies to franchisee-plaintiffs who have

successfully obtained monetary and/or injunctive relief against their franchisor.  It simply does

---

[8] The Court must note that having concluded that Plaintiffs were justified in terminating the SVG, EBV and EFV franchises, the Court considers it apparent that a failure by these Defendants to cease operating as a franchise of Plaintiffs and to cease identifying their premises with Plaintiffs' marks would warrant granting injunctive relief to Plaintiffs upon appropriate application.  An injunction need not be issued at this time, since the Court has no reason to assume that Defendants will not comply with the Court's directive.

not apply to Defendants in this action.  Thus, Defendants' application for an award of attorneys' fees will be denied.

Pursuant to FED. R. CIV. P. 52(a), the Court presents its findings of fact and conclusions of law.

### FINDINGS OF FACT

I.     This Opinion incorporates by reference all stipulated facts set forth in the Final Pretrial Order.

II.    Based on the evidence presented at trial, this Court now makes the following findings of fact:

1.     In 2004, 2005 and 2006, SVG, EBV and EFV paid various personal expenses on behalf of employees working in the combination Dunkin' Donuts/Baskin' Robbins franchised retail shop operated by SVG or the Dunkin' Donuts franchised retail shop(s) operated by EBV or EFV.

3.     The above-referenced payments of personal expenses made by SVG, EBV and EFV included thousands of dollars paid in rent for apartments in which employees resided, employee car leases and employee airfare.

4.     Franchisees SVG, EBV and EFV did not treat the above-referenced payments as employee compensation.  They did not report the payment amounts as wages on the W-2 forms prepared for the employees or on the 941 forms filed by SVG, EBV and EFV in 2004, 2005 and 2006.

5.     SVG, EBV and EFV did not withhold payroll tax from these amounts.

6.     Shah, one of the principals and owners of SVG, EBV and EFV, kept and

maintained the books and records of those companies.  He was aware of the nature of the payments made by those companies in 2004, 2005 and 2006 on behalf of employees.  He chose to treat the amounts paid as business expenses, rather than employee compensation, and logged them accordingly in the general ledgers kept for SVG, EBV and EFV.

7.  Shah's education, college degrees in finance and accounting, professional background and business experience demonstrate that he possesses a level of sophistication which made or should have made him aware that SVG's, EBV's and EFV's payments of personal expenses on behalf of employees constituted compensation to the employees.

8.  Shah's conversations with Hemish Kapadia, an accountant retained by Shah and Desai to prepare tax returns and documents on their own personal behalf as well as on behalf of SVG, EBV and EFV, further demonstrate that Shah knew or should have known that the payments of employees' personal expenses, and in particular the rental payments, constituted employee compensation.

9.  Kapadia relied on information provided by Shah, including the general ledgers, to prepare the tax documents for 2004 and 2005, including corporate tax returns and corporate 941 forms.  Shah knew that the accountant relied on the information he provided.

10.  Michael Vernoia, another accountant retained by Shah and Desai to prepare tax returns and documents, also relied on information provided by Shah, including the general ledgers, to prepare tax documents for 2006.  Shah knew that the

46

accountant relied on the information he provided.

11.     Through the actions of Shah, SVG, EBV and EFV knowingly concealed the true nature of the payments made on behalf of employees' personal expenses.  Over the course of at least three years, they made a calculated decision to log the payments as something other than employee wages in corporate records, to file tax documents that did not report such payments as wages, and to withhold no payroll tax related to these payments.

12.     Dunkin' investigated the three franchise businesses operated by SVG, EBV and EFV and by the principals and owners of these companies, Shah and Desai beginning in 2005.  By the end of 2006, it had gathered information indicating that SVG, EBV and EFV were paying personal expenses on behalf of employees without reporting such payments as wages in tax documents and without withholding the payroll tax amounts required by law.

13.     Based, in part, on this information, Dunkin' concluded that SVG, EBV and EFV had defaulted on its obligation under the Franchise Act's "obey all laws" clause which required the franchisee to "comply with all civil and criminal laws, ordinances, rules, regulations and orders of public authorities pertaining to the maintenance and operation of the Unit, including, but not limited to, those relating to health, safety, sanitation, employment, environmental regulation and taxation." (Franchise Agreement ¶ 5.1.7.)

14.     Dunkin' determined that these defaults were not curable under the Franchise Agreement and decided to terminate its Franchise Agreements with SVG, EBV

47

and EFV.  It also decided to terminate a Dunkin' franchise operated by franchisee

MRV, another corporation owned by Shah and Desai.

15.    Dunkin', through legal counsel, prepared and sent an April 23, 2007 letter to

SVG, EBV, EFV and MRV advising that the franchises were terminated, pursuant

to section 9 of the Franchise Agreements binding franchisees SVG, EBV, EFV

and MRV, effective 60 days from the date of the letter.

16.    The April 23, 2007 letter gave Dunkin's reasons for exercising its rights of

termination under the Franchise Agreement.  Among other reasons provided, the

letter stated:

> It is also a violation of the Franchise Agreements to fail to comply
> with all applicable laws, rules, regulations, ordinances, and orders of
> public authorities (Paragraph 5.1.7) and to perform, directly or indirectly,
> any act injurious or prejudicial to the goodwill associated with
> Franchisor's Proprietary Marks and System.  (Paragraph 8.0.1.)

> Based on a variety of evidence, Franchisor has concluded that you
> have violated applicable labor laws and tax laws by, among other things,
> failing to accurately report employee wages, failing to pay all payroll taxes
> due, and filing false tax returns.  Franchisor has concluded that you have
> used your franchised business to defraud the taxing authorities.  Among
> other things, you have paid wages to or on behalf of one or more of your
> employee without issuing W-2s or collecting payroll taxes on those
> monies.  You have also deducted those monies as business expenses for
> tax purposes.  Your actions are in breach of the Franchise Agreements in
> that they are injurious or prejudicial to the goodwill associated with
> Franchisor's proprietary marks and constitute a failure to comply promptly
> with all applicable laws.

> Each of these breaches constitutes a default under Paragraph 9 of
> the Franchise Agreement and common law fraud.  Furthermore, pursuant
> to Paragraph 9.1.4 of the Franchise Agreement and as a matter of law,
> these breaches and fraud cannot be cured and are good cause for
> termination of the Franchise Agreements.

(Pl. Ex. 13.)

17.     No evidence was presented that MRV paid the personal expenses of employees of its Dunkin' Donuts franchised retail shop on or before the date of the above-referenced termination letter without giving the payments appropriate tax treatment under federal payroll tax laws.

18.     No evidence was presented that MRV violated any other Franchise Agreement with Dunkin' or a related entity.

## CONCLUSIONS OF LAW

1.     As franchisees operating in New Jersey, SVG, EBV, EFV and MRV and the owners and principals of these companies, Shah and Desai, are entitled to the protections of the New Jersey Franchise Practices Act.

2.     Dunkin' had good cause as required by the New Jersey Franchise Practices Act to terminate the Franchise Agreements with SVG, EBV and EFV.

3.     Amounts paid by SVG, EBV and EFV in 2004, 2005 and 2006 in payment of employees' personal expenses such as rent, car lease and travel constitute wages within the meaning of 26 U.S.C. § 3401.

4.     SVG, EBV and EFV materially breached the Franchise Agreements' "obey all laws" clause by failing to report to the IRS various payments made on behalf of employees as wages and failing to withhold payroll taxes on those amounts as required by federal law. 26 U.S.C. §§ 3101(a) and (b), 3102(a), 3111(a) and (b), 3402(a)(1); 26 C.F.R. §§ 31.6011(a)-1T(a)(1) and 4T(a)(1).

5.      The material breach of the Franchise Agreements committed by SVG, EBV and
EFV by failing to comply with federal payroll tax reporting and withholding laws
constituted a non-curable default of their respective Franchise Agreements.

6.      The information collected by Dunkin' as to SVG's, EBV's and EFV's
noncompliance with payroll laws amounted to proof establishing by a
preponderance of the evidence that these three franchisees had committed felony
tax offenses, specifically attempted tax evasion in violation of 26 U.S.C. § 7201
and filing false tax documents in violation of 26 U.S.C. § 7206(1).

7.      Dunkin' provided 60 days' advance notice of termination of the franchises in
compliance with the New Jersey Franchise Practices Act.

8.      Dunkin's April 23, 2007 letter advising SVG, EBV, EFV and MRV that their
franchises were terminated pursuant to the Franchise Agreement complied with
the Franchise Practices Act's written notice requirement.

9.      Dunkin' gave reasons for the termination of the SVG, EBV, EFV and MRV
franchises in the April 23, 2007 letter in compliance with the New Jersey
Franchise Practices Act.

10.     Dunkin' proved at trial that SVG, EBV and EFV committed payroll tax violations
in breach of the Franchise Agreement's obey all laws clause, which was one of the
reasons for termination expressly set forth in the April 23, 2007 letter.

11.     Dunkin's termination of the SVG, EBV and EFV franchises complied with the
New Jersey Franchise Practices Act.

12.     Dunkin' did not have good cause to terminate the franchise operated by MRV.

13. Dunkin' did not prove that MRV violated any provision of the Franchise Agreement justifying termination.

14. Dunkin' did not prove that MRV's termination was justified under the cross-default provision in its Franchise Agreement because it did not prove that MRV had defaulted under any other agreement with Dunkin' or a related entity.

15. Dunkin's termination of the MRV franchise did not comply with the New Jersey Franchise Practices Act.

16. Dunkin' is entitled to exercise its contractual rights of termination as against SVG, EBV and EFV under the Franchise Agreements binding those parties.

17. Dunkin' is not barred from relief by the doctrine of unclean hands.


An appropriate Order will be filed herewith.


            <u>   s/ Stanley R. Chesler   </u>
            STANLEY R. CHESLER, U.S.D.J.

Dated: November 10, 2010